Donna McGRATH, Robert Jinks, a/k/a Tanya Jinks, a/k/a Tanya Medina, and Norbert Lopez, a/k/a Tara Lopez, Plaintiffs–Appellees,

v.

TOYS "R" US, INC., Defendant–Appellant.

Docket No. 02–9308.

United States Court of Appeals, Second Circuit.

Argued: Sept. 22, 2003.

Certified: Jan. 23, 2004.

Decided: June 2, 2005.

H. Nicholas Goodman, Quirk & Bakalor, P.C., New York, New York, for Defendant–Appellant.

**514**

Thomas D. Shanahan, Shanahan & Associates, P.C. (Anthony A. LoPresti, Davidson & LoPresti, L.L.P.; Marissa Goldfaden, on the brief), New York, New York, for Plaintiffs–Appellees.

Before: FEINBERG and RAGGI, Circuit Judges, and McKENNA, District Judge.[1]

RAGGI, Circuit Judge.

Defendant–Appellant Toys "R" Us, Inc., appeals from a judgment entered on October 22, 2002, in the United States District Court for the Eastern District of New York (Charles P. Sifton, *Judge* ), awarding Plaintiffs–Appellees Donna McGrath, Robert Jinks (also known as "Tanya Jinks" and "Tanya Medina"), and Norbert Lopez (also known as "Tara Lopez") $193,551 in attorney's fees pursuant to New York City Administrative Code § 8–502(f). As we explained in an earlier opinion in this case, *McGrath v. Toys "R" Us, Inc.*, 356 F.3d 246, 247 (2d Cir.2004), plaintiffs are eligible for attorney's fees because they prevailed at trial on a claim that Toys "R" Us had discriminated against them in a public accommodation based on gender and sexual orientation in violation of local law. The parties' appellate dispute concerns the reasonableness of the district court's fee award given that the jury had voted each plaintiff only $1 in nominal damages. Because of ambiguities in New York law regarding the standards applicable to determining a reasonable fee award under Administrative Code § 8–502(f) in a case of nominal damages, we certified certain questions pertaining to that issue to the New York Court of Appeals. *See id.* at 254. In response, the New York Court of Appeals has unequivocally adopted both

the general rule of *Farrar v. Hobby,* 506 U.S. 103, 115, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), that no attorney's fees should be awarded to plaintiffs who recover only nominal damages, and this court's recognition of a public purpose exception to that rule. *See McGrath v. Toys "R" Us, Inc.,* 3 N.Y.3d 421, 788 N.Y.S.2d 281, 821 N.E.2d 519 (2004). The Court of Appeals has, however, approved a broader inquiry with respect to public purpose than has previously been applied by this court in cases arising under federal law. Because we cannot conclude on the record before us that such a broader inquiry would necessarily support an award of fees in the amount originally ordered by the district court, we remand the case for further proceedings consistent with this opinion and that of the New York Court of Appeals.

## I. *Background*

### A. *Proceedings Before the District Court*

Although we assume familiarity with our prior opinion in this case, we briefly reiterate the facts relevant to the district court's challenged award of fees. *See McGrath v. Toys "R" Us, Inc.,* 356 F.3d at 248–49.

On December 13, 2000, plaintiffs, three pre-operative transsexuals, visited a Toys "R" Us store in Brooklyn, where several employees made derogatory remarks about plaintiffs' sexuality. Similar events occurred on December 20, 2000. On May 15, 2001, plaintiffs invoked federal diversity jurisdiction to sue Toys "R" Us in the United States District Court for the Eastern District of New York for discrimination pursuant to New York City Administrative Code § 8–502, part of the City's Human Rights Law.[2] Specifically, plaintiffs

---

[2]. Section 8–502 provides, in relevant part,

alleged that Toys "R" Us, through its employees, had denied them the advantages, privileges, and facilities of one of its stores because of plaintiffs' transsexuality, in violation of Administrative Code § 8–107.4.[3] Following failed settlement negotiations, a ten-day trial ensued at which plaintiffs urged the jury to consider a compensatory award of several hundred thousand dollars, and a multi-million dollar punitive award. On June 27, 2002, the jury returned a verdict in favor of plaintiffs but awarded each only $1 in nominal damages and no punitive damages.

Thereafter, on July 17, 2002, plaintiffs petitioned the district court for attorney's fees pursuant to Administrative Code § 8–502(f).[4] Plaintiffs, to support their petition, and defendant, to oppose it, relied upon case law applying fee provisions in federal civil rights statutes, such as 42 U.S.C. §§ 1988 and 2000e–5(k). These laws, like New York City Administrative Code § 8–502(f), permit fee awards only if the petitioner is a "prevailing party," and the requested fee is "reasonable."[5] Given the parties' reliance upon federal law and not-

ing that other courts had evaluated § 8–502(f) fee petitions by reference to parallel federal law, the district court ruled that it would rely upon federal standards in determining what, if any, attorney's fees to award the plaintiffs. *See McGrath v. Toys "R" Us, Inc.*, No. 01 Civ. 3071, 2002 U.S. Dist. LEXIS 22610, at *3 (E.D.N.Y. Oct. 16, 2002).

In its argument to the district court, Toys "R" Us conceded that plaintiffs were "prevailing parties"; however, it maintained that no fees should be awarded because the Supreme Court, applying federal law in *Farrar v. Hobby*, had ruled that "when a plaintiff recovers only nominal damages ... the only reasonable fee is usually no fee at all." 506 U.S. at 115, 113 S.Ct. 566. The district court acknowledged *Farrar*'s holding, but concluded that plaintiffs were nevertheless entitled to attorney's fees because their lawsuit had served a significant public purpose by being the first to succeed at trial on a § 8–107.4(a) claim of unlawful discrimination against transsexuals in a public accommo-

that "any person claiming to be aggrieved by an unlawful discriminatory practice ... shall have a cause of action in any court of competent jurisdiction for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate." N.Y. City Admin. Code § 8–502(a).

3. Section 8–107.4 provides, in relevant part:

It shall be an unlawful discriminatory practice for any person, being the ... manager, ... agent or employee of any place or provider of public accommodation, because of the actual or perceived ... gender ... [or] sexual orientation ... of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, or, directly or indirectly, to make any declaration ... to the effect that any of the accommodations, advantages, facilities and privileges of any such place or provider shall be refused, withheld from or denied to

any person on account of ... gender ... [or] sexual orientation ... or that the patronage or custom of any person belonging to, purporting to be, or perceived to be, of any particular ... gender ... [or] sexual orientation ... is unwelcome, objectionable or not acceptable, desired or solicited. N.Y. City Admin. Code § 8–107.4(a).

4. Section 8–502(f) provides: "In any civil action commenced pursuant to this section, the court, in its discretion, may award the prevailing party costs and reasonable attorney's fees." N.Y. City Admin. Code § 8–502(f).

5. Title 42 U.S.C. § 1988(b) provides, in relevant part, that "the court, in its discretion, may allow the prevailing party" in various federal civil rights actions, "a reasonable attorney's fee as part of the costs." Similarly, 42 U.S.C. § 2000e–5(k) provides that in Title VII actions, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee."

dation. Indeed, the district court noted that, when plaintiffs filed their lawsuit, it was unresolved whether the public accommodation protections of § 8–107.4(a) even extended to transsexuals. *See McGrath v. Toys "R" Us, Inc.*, 2002 U.S. Dist. LEXIS 22610, at *6–*7. Accordingly, the court awarded plaintiffs $193,551 in attorney's fees, *id.* at *17, prompting Toys "R" Us to file this timely appeal.

### B. Certification to the New York Court of Appeals

#### 1. This Court's Inquiry

Recognizing a dearth of New York cases interpreting or applying the fee provision of the New York City Human Rights Law, as well as the uncertainty of New York law concerning the applicability of *Farrar v. Hobby* to an award of attorney's fees for prevailing civil rights litigants who recovered nominal damages, this court certified the following questions to the New York Court of Appeals:

1. In determining whether an award of attorney's fees is reasonable under New York City Administrative Code § 8–502(f), does New York apply the standards set forth in *Farrar v. Hobby*, 506 U.S. at 114–15, 113 S.Ct. 566, 121 L.Ed.2d 494, *i.e.*, (a) that "the most critical factor ... is the degree of success," and (b) that when a party is awarded nominal damages, "the only reasonable fee is usually no fee at all"?

2. If the *Farrar* standard does not apply, what standard should a court use to determine what constitutes a reasonable fee award for a prevailing party who has received only nominal damages?

3. If the *Farrar* standard applies, does Administrative Code § 8–502(f) authorize a fee award to a prevailing plaintiff who receives only nominal damages but whose lawsuit served a significant public purpose?

4. If New York recognizes "service of a significant public purpose" as a factor warranting an attorney's fee award to a plaintiff recovering only nominal damages, would a plaintiff who is the first to secure a favorable jury verdict on a claim of unlawful discrimination against transsexuals in public accommodation, *see* N.Y. City Admin. Code § 8–107.4(a), be entitled to a fee award even though the law's prohibition of discrimination against transsexuals in employment, *see id.* § 8–107.1(a), has previously been recognized?

*McGrath v. Toys "R" Us, Inc.*, 356 F.3d at 254.

#### 2. New York's Response

The New York Court of Appeals accepted our certification and responded to "questions 1, 3 and 4 in the affirmative, rendering question 2 academic." *McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d at 428, 788 N.Y.S.2d at 283, 821 N.E.2d 519.

With specific reference to our first inquiry, the Court of Appeals rejected plaintiffs' argument that the general *Farrar* rule—that "[w]hen a plaintiff recovers only nominal damages ... the only reasonable fee is usually no fee at all," 506 U.S. at 115, 113 S.Ct. 566—should not apply to the fee provision of the City Human Rights Law. The Court of Appeals observed that § 8–502(f) "is substantively and textually indistinguishable from its federal counterparts." *McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d at 434, 788 N.Y.S.2d at 289, 821 N.E.2d 519.

In responding to our third inquiry, the Court of Appeals noted that federal courts had derived from Justice O'Connor's *Farrar* concurrence a " 'significant public purpose' exception" to the general *Farrar* rule. *Id.* at 432, 788 N.Y.S.2d at 286 (citing *Pino v. Locascio*, 101 F.3d 235, 238–39

(2d Cir.1996); *Cabrera v. Jakabovitz,* 24 F.3d 372, 393 (2d Cir.1994)); *see also Farrar v. Hobby,* 506 U.S. at 120–21, 113 S.Ct. 566 (O'Connor, J., *concurring* ). Noting its "general practice of interpreting comparable [state and federal] civil rights statutes consistently," *McGrath v. Toys "R" Us, Inc.,* 3 N.Y.3d at 433, 788 N.Y.S.2d at 287, 821 N.E.2d 519, and finding no "basis in the legislative history for a different [state] standard," the Court of Appeals concluded that such a "public purpose exception" was a part of "the *Farrar* standard ... applicable to attorney's fees claims under the New York City Human Rights Law." *id.* at 434, 788 N.Y.S.2d at 288.

The New York Court of Appeals narrowly construed our fourth inquiry to ask whether plaintiffs' "claim could have fallen within the 'significant public purpose' exception addressed in the *Farrar* concurrence even though, prior to this litigation, some courts had held that transsexuals were protected from employment discrimination under the New York City Human Rights Law." *Id.* The court answered the question "in the affirmative because we cannot say, as a matter of law, that a court that reached that conclusion would have abused its discretion." *Id.* The court was careful to emphasize, however, that it had not been asked "to apply the *Farrar* standard to the facts and circumstances of this case" and, thus, did not decide "whether it was appropriate for the District Court to grant attorney's fees in the full lodestar figure given the extent of relief plaintiffs obtained." *Id.*

## II. *Discussion*

The decision of the New York Court of Appeals in this case helpfully clarifies the standard of New York law applicable to attorney's fee awards under Administrative Code § 8–502(f). It does not, however-

er, resolve the ultimate question raised by this appeal: whether the district court's particular fee award to the plaintiffs was reasonable. To explain: although the Court of Appeals' response to our fourth certified question might, at first glance, appear to support affirmance of the district court's award of fees as a reasonable exercise of discretion, on closer inspection, the state court's decision suggests the need for further review of the totality of facts and circumstances relevant to plaintiffs' fee award.

Three factors inform our conclusion. First, the New York Court of Appeals appears to have articulated a broader definition for the public purpose exception than that previously recognized by this court or applied by the district court. Thus, even if the challenged fee award does not fit neatly within our federal precedent, as we conclude it does not for reasons explained herein, facts and circumstances might still be identified that bring the case within the public purpose exception now recognized by New York. Second, the Court of Appeals was careful to note that the factors it identified as relevant to a public purpose exception were neither exclusive nor determinative, *see McGrath v. Toys "R" Us, Inc.,* 3 N.Y.3d at 436, 788 N.Y.S.2d at 289, 821 N.E.2d 519, suggesting the possibility of further factual review. Third, at the same time that the Court of Appeals emphasized that it was not itself ruling on the appropriateness of the particular fee award in this case, *see id.* at 434, 436, 788 N.Y.S.2d at 288, 289, 821 N.E.2d 519, the majority specifically noted that "factors addressed in the dissent" for rejecting the challenged fee award "may [also] be relevant to the federal court that will be evaluating [its] propriety." *Id.* at 436 n. 5, 788 N.Y.S.2d at 289 n. 5, 821 N.E.2d 519; *see id.* at 437, 788 N.Y.S.2d at 289, 821 N.E.2d 519 (Reid,

Smith, R.S., JJ., dissenting from response to fourth certified question).

Thus, we conclude that New York law contemplates a further, expansive review of factors supporting and opposing a fee award in this case, and we now consider whether that review should be undertaken, in the first instance, by this court or by the district court. In reaching the latter conclusion, we preliminarily observe that, because many of the factors identified in the opinions of the New York Court of Appeals had not been referenced in this court's prior precedent, the district court understandably did not factor them into its initial analysis. Nevertheless, the district court's intimate familiarity with the circumstances underlying the prosecution of this case provides it with unique insights invaluable to an expanded inquiry. Indeed, this conclusion is reinforced by the fact that the parties appear to dispute facts relevant to some of the factors identified by the New York Court of Appeals. Thus, the possible need for an evidentiary hearing also supports remanding this case to the district court.

To assist the district court in its task on remand, we discuss in more detail the factors informing our conclusion that the state court's responses to our certified questions require further review of the fee award in this case.

### A. The State Court's Broader Articulation of the Public Purpose Exception

#### 1. Federal Precedent Emphasizing Vindication of a Groundbreaking Legal Theory

Under our court's precedents, an "award of fees" to a plaintiff recovering nominal damages "will be rare," appropriate only when a plaintiff's success relies on a "new rule of liability that serve[s] a significant public purpose." *Pino v. Locascio*, 101 F.3d at 238–39; *see also Cabrera v. Jakabovitz*, 24 F.3d at 393. As we explained in *Pino*, "the vast majority of civil rights litigation does not result in ground-breaking conclusions of law," and will warrant fee awards only "if a plaintiff recovers some significant measure of damages or other meaningful relief." *Id.*[6]

Plaintiffs' success in this case did not establish a groundbreaking legal theory. As the dissenting judges of the New York Court of Appeals observed:

While in some instances the first jury verdict pursuant to a particular statutory provision may qualify as a case of first impression, this cannot be so where, as here, the purportedly groundbreaking legal principle—the recognition of transsexuals as members of a protected class safeguarded by the New York City Human Rights Law—had already

---

**6.** An injunction against future discrimination most obviously qualifies as other meaningful relief. *See, e.g., LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 758–59 (2d Cir.1998) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 435 n. 11, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Although plaintiffs' complaint sought injunctive and declaratory relief in this case, it appears that such remedies were not pursued at trial. Thus, plaintiffs' attempt to analogize their case to *Cabrera v. Jakabovitz*, 24 F.3d at 372, is unconvincing not only because *Cabrera* established a "new rule" imposing vicarious liability on landlords for "racial steering" by real estate agents who showed their property in violation of the Fair Housing Act, 42 U.S.C. §§ 3601–3619, but because the *Cabrera* plaintiffs, in addition to recovering $1 in nominal damages, also secured extensive declaratory and injunctive relief. *See Cabrera v. Fischler*, 814 F.Supp. 269, 282–83 (E.D.N.Y.1993) (enjoining landlord to publish in local newspapers for twelve weeks notice of non-discrimination policy, to modify letterhead to include Equal Housing Opportunity logo, and to cease any rental discrimination based on race, color, religion, or national origin).

been supported by the only courts to have considered the question. *McGrath v. Toys "R" Us, Inc.,* 3 N.Y.3d at 437–38, 788 N.Y.S.2d at 290–91, 821 N.E.2d 519. Several years before plaintiffs commenced their discrimination suit, the New York City Commission on Human Rights, a New York State Supreme Court, and a federal district court had all concluded that § 8–107 of the New York City Human Rights Law prohibited discrimination against transsexuals. *See Arroyo v. New York City Health & Hosp. Corp.,* No. EM01120–04–12–89–DE, 1994 WL 932424, at *3–*4 (N.Y. City Comm'n on Human Rights Mar. 11, 1994) (applying § 8–107 to employment discrimination claim of pre-operative transsexual, but dismissing for insufficient evidence); *see also Maffei v. Kolaeton Indus., Inc.,* 164 Misc.2d 547, 555–56, 626 N.Y.S.2d 391, 396 (Sup.Ct. N.Y.Cty.1995) (holding that creation of a hostile work environment based upon an employee's transsexuality is a form of sex discrimination violative of § 8–107); *accord Rentos v. Oce–Office Sys.,* No. 95 Civ. 7908, 1996 WL 737215, at *8–*9 (S.D.N.Y. Dec.24, 1996) (relying on *Maffei* to hold that plaintiff could maintain a transsexuality discrimination claim under New York City and State law). Based on this precedent, Toys "R" Us did not attempt to dispute the applicability of § 8–107 to plaintiffs' claim of discrimination against transsexuals. Instead, its defense in the action was essentially factual, challenging plaintiffs' ability to adduce convincing evidence that they were victims of the charged discrimination.

Plaintiffs nevertheless contend that their suit was "groundbreaking" because it was the first to succeed on a claim of discrimination against transsexuals in a place of public accommodation, *see* N.Y. City Admin. Code § 8–107.4(a), whereas earlier cases had involved discrimination against transsexuals in the employment context,

*see id.* § 8.107.1(a). The argument is unconvincing. As the New York Court of Appeals specifically recognized, the respective provisions of § 8–107.4 (governing public accommodation) and § 8–107.1 (regulating employment) "protect the same classes of individuals." *McGrath v. Toys "R" Us, Inc.,* 3 N.Y.2d at 435, 788 N.Y.S.2d at 288. Consequently, plaintiffs' success in a public accommodation setting cannot reasonably be considered to establish a new legal theory when the Code's protection for transsexuals had already been repeatedly and consistently recognized.

In any event, prior to trial in this case, on April 30, 2002, the New York City Council amended the city's Human Rights Law explicitly to cover transsexuals by amending the Code's definition of "gender" to include discrimination on the basis of "gender identity or expression." N.Y. City Admin. Code § 8–102 (amended 2002). As noted by the Court of Appeals, this amendment "eras[ed] any doubt about whether transsexuals were protected under the code." *McGrath v. Toys "R" Us, Inc.,* 3 N.Y.3d at 435, 788 N.Y.S.2d at 288–89, 821 N.E.2d 519. Thus, the fact that plaintiffs were the first to succeed at trial on a claim of discrimination against transsexuals did not involve a novel issue of law, establish a new theory of liability, or even create much in the way of helpful precedent because their claims were adjudicated under an old law that was revised and clarified before the jury was even selected in plaintiffs' case. *See McGrath v. Toys "R" Us, Inc.,* 3 N.Y.3d at 438–39, 788 N.Y.S.2d at 290–91, 821 N.E.2d 519 (Reid, J., dissenting). Under these circumstances, plaintiffs' suit does not qualify as one of the "rare" cases to satisfy the public purpose exception under this court's precedents in *Pino v. Locascio,* 101 F.3d at 239, and *Cabrera v. Jakabovitz,* 24 F.3d at 393.

### 2. New York's View of the Public Purpose Exception

■ In responding to our certified questions, the New York Court of Appeals appears to have defined the public purpose exception to the general *Farrar* rule more expansively under state law than had our federal precedents. Specifically, the Court of Appeals rejected the argument that prior recognition of a legal theory by lower courts by itself precluded a finding that subsequent successful litigation on that recognized theory served a public purpose. The court observed that "the fact that a handful of lower courts had interpreted the statute broadly did not put to rest the scope of coverage issue." *McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d at 436, 788 N.Y.S.2d at 289, 821 N.E.2d 519. In any event, the court identified two ways in which "a judgment in favor of a historically unrecognized group" could serve a public purpose even when the relied-upon legal theory had already received some judicial recognition: (1) "a groundbreaking verdict can educate the public concerning substantive rights and increase awareness as to the plight of a disadvantaged class," and (2) such a verdict "can communicate community condemnation of unlawful discrimination." *Id.*[7]

The Court of Appeals did not discuss further the "community condemnation" prong of its conception of public purpose. We note that, to the extent every verdict in favor of a plaintiff in a discrimination case communicates some measure of community condemnation for the charged disparate treatment, we do not understand the Court of Appeals' ruling to sweep all such cases into a public purpose exception. Rather, we assume that the Court of Appeals was referring to the earliest verdicts in favor of plaintiffs who claim they were victims of particular forms of discrimination. Such early verdicts convey that, not only are there laws on the books proscribing certain discriminatory conduct, but the community, acting through juries, condemns that conduct and will hold transgressors to account. To the extent plaintiffs secured the first jury verdict in a case involving discrimination against transsexuals, it thus appears that New York law weighs this factor in their favor with respect to the challenged fee award.

As to the second public purpose factor identified by the Court of Appeals, educating the public, the court observed that "many city residents might have been unaware at the time of [the] verdict [in plaintiffs' case] that discrimination against transsexuals was prohibited." *Id.* Indeed, the court observed that this very possibility played a part in the City Council's decision to clarify the scope of the Human Rights law shortly before plaintiffs' case proceeded to trial. Although it was the view of the City Council that the Code "already protected transsexuals," there was concern that "without the amendment, the law could be misinterpreted as excluding this class of individuals from coverage." *McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d at 435, 788 N.Y.S.2d at 289, 821 N.E.2d 519 (citing Local Law 3, § 1 ["Legislative findings and intent"]). Notably, the Court of Appeals did not find that plaintiffs' case had, in fact, educated the public about the local law's protection of transsexuals from discrimination, nor did it hold that evidence to that effect would, by itself, compel a fee award. Instead, the court ruled simply that the twin factors

---

7. Because this case arises under the New York City Human Rights Law, we need not consider and do not here address whether the broader definition of public purpose articulated by the Court of Appeals would also properly inform an analysis of attorney's fee awards under federal law.

identified by the *McGrath* majority (which it referred to as one) were appropriately considered in determining the propriety of a fee award to the plaintiffs, although the factors were neither exclusive nor determinative: "It is therefore reasonable for a court to consider whether the verdict served this function [of educating the public and expressing community condemnation] in determining the significance of the relief obtained, although this is neither the only factor that may be considered nor will it necessarily be determinative." *Id.* at 436, 788 N.Y.S.2d at 289, 821 N.E.2d 519.

Indeed, the Court of Appeals expressly noted that factors supporting a fee award in this case might appropriately be balanced against countervailing factors identified by the *McGrath* dissenters. *See id.* at 436 n. 5, 788 N.Y.S.2d at 289 n. 5, 821 N.E.2d 519. These factors include a number to which we have already alluded: (1) the fact that "the purportedly groundbreaking legal principle—the recognition of transsexuals as a protected class safeguarded against discrimination by the New York City Human Rights Law—had already been supported by the only courts to have considered the question," *id.* at 437–38, 788 N.Y.S.2d at 290, 821 N.E.2d 519 (Reid, J., dissenting); (2) the same interpretation of the Human Rights Law in a number of administrative decisions by the city agency charged with its enforcement, *see id.*; (3) the amendment of the Human Rights Law—two months before the start of plaintiffs' trial—"to guard against any misinterpretation" of its protection of transsexuals, which, in the dissent's view, rendered plaintiffs' suit "even more obviously irrelevant" to the establishment of such protection, *id.*; and (4) the fact that "defendant never contested the supposedly novel issue of law on which plaintiffs prevailed and premise their request for attorney's fees," but instead acknowledged "from the outset of this litigation" that the Human Rights Law's protection applied to pre-operative transsexuals and "litigated only factual issues related to whether and to what extent defendant's actions discriminated against plaintiffs," *id.* at 439, 788 N.Y.S.2d at 291, 821 N.E.2d 519. These factors, particularly the last, operate as significant counterweights to the argument that a verdict in this case was necessary to express community condemnation for discriminatory conduct towards transsexuals. The dissent identified a further factor that might weigh against a fee award, or a full fee award, in this case: (5) the circumstances surrounding the breakdown of settlement discussions. *Id.* Apparently, "[s]ettlement talks collapsed on the eve of trial when plaintiffs demanded $600,000 (just reduced from $3.2 million plus attorney's fees), and defendant signaled a willingness to enter into productive negotiations only if plaintiffs lowered their demand to $60,000 (increased from a longstanding offer of $10,000)." *Id.*

## B. The Need for Further Factual Development

■ The New York Court of Appeals' broad articulation of a public purpose exception to the general *Farrar* rule, coupled with its recognition that myriad countervailing factors may be relevant to whether a court awards full, partial, or no fees even in a case that serves a public purpose, strongly signals the need for a careful balancing of the totality of the circumstances to assess the reasonableness of the fee award in this case. Because neither the district court nor the parties contemplated some of the factors identified by the Court of Appeals, and because the parties appear to dispute the underlying facts relevant to some of these factors, the record

is not sufficiently developed to allow meaningful review by this court.

For example, the question of the degree to which plaintiffs' litigation "educated" the public about transsexual rights admits no easy answer on the present record. Plaintiffs assert that their case garnered considerable press coverage, thereby educating the public about transsexual rights. While some media exposure may well raise public awareness as to prohibited discrimination, tabloid coverage that tends toward the sensational rather than the informative may not serve this goal, or may do so only minimally. Thus, a careful review of the content of any press coverage, specifically with respect to its discussion of the legal rights of transsexuals, is necessary to determine if plaintiffs' lawsuit had the educational effect that the New York Court of Appeals included within its public purpose exception to the general *Farrar* rule.

As further evidence that their lawsuit served an educational function, plaintiffs note that their case was discussed at length during the City Council meetings that led to the 2002 amendment of the Human Rights Law. If plaintiffs can demonstrate on remand that their lawsuit was a motivating factor or impetus for *public* hearings held by the City Council with respect to ensuring transsexual rights, such evidence could properly be considered in assessing the degree to which a public educational purpose was served by the favorable verdict achieved in this litigation.

Similarly relevant to this point may be plaintiffs' counsel's representation that the news that plaintiffs had "won" their lawsuit prompted "[h]undreds of transgendered person[s] from around the country to contact [him]." Plaintiffs' Affirmation in Further Support of Petition For Attorney's Fees ¶ 22. Here again, the facts must be carefully reviewed to discern if plaintiffs' verdict educated victims of transsexual discrimination as to their rights under the New York City Human Rights Law, the only law here at issue, or simply generated favorable publicity for their attorney.

Even if plaintiffs can demonstrate that their lawsuit served an educational purpose and that the verdict in their case was the first to express community condemnation for discrimination against transsexuals, the decision of the Court of Appeals indicates that countervailing factors are also properly considered in determining a reasonable fee award. The fact that plaintiffs' theory of liability had been recognized without exception by lower courts and the enforcing administrative agency, the fact that Toys "R" Us never contested that theory but defended the case only on the facts, and the fact that a pre-trial clarification in the applicable law deprived plaintiffs' case of significant precedential value, even if not a legal bar to a fee award, might properly be considered as grounds to grant only a partial award. The facts and circumstances leading to the collapse in settlement discussions, on which the parties disagree, are also relevant to the propriety of a reduced fee.

While we are obliged to remand this case to the district court to ensure proper consideration of the totality of circumstances informing the public purpose exception as recognized by the New York Court of Appeals, it is with considerable reluctance that we prolong this litigation. Indeed, we encourage the parties to consider mutual compromises that may permit settlement of this fee dispute without further burden to the district court or expense to their clients. Should that prove impossible, we are confident in the ability of the district court to conduct any necessary hearings, make appropriate findings, and balance the competing interests to

make a reasonable award. We remind the parties that now that the New York Court of Appeals has clarified applicable state law and specifically concluded that, as a matter of law, this case could support an award of fees, *see McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d at 434, 788 N.Y.S.2d at 288, 821 N.E.2d 519, any further review by this court of any fee award by the district court will be highly deferential and limited to abuse of discretion, *see Pino v. Locascio*, 101 F.3d at 237; *see also Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir.2001).

### III. *Conclusion*

To summarize, although we conclude that plaintiffs' trial success does not satisfy the narrow "ground-breaking conclusions of law" exception recognized by this court's prior precedent for fee awards in cases arising under federal discrimination law, *Pino v. Locascio*, 101 F.3d at 239, the New York Court of Appeals has ruled in response to our certified inquiry that a fee cannot be rejected as a matter of state law in this case in light of its broader articulation of a public purpose exception to the general rule in *Farrar v. Hobby*, 506 U.S. at 115, 113 S.Ct. 566. Because that articulation contemplates consideration of factors not previously addressed by the district court and not adequately developed on the present record, we hereby remand this case for further factual development and consideration of the challenged fee award consistent with this opinion and *McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d 421, 788 N.Y.S.2d 281, 821 N.E.2d 519 (2004).

Pursuant to the procedure utilized in *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir.1994), upon a letter from the parties to the Clerk of this Court within 30 days of entry of the district court order resolving the attorney's fee issue on re-

mand, jurisdiction will automatically be restored to this appellate panel without a new notice of appeal.